[No. 2709. Decided October 8, 1897.]

THE STATE OF WASHINGTON, *on the Relation of George M. Hellar*, v. CYRUS W. YOUNG, *as State Treasurer*.

TIDE LAND FUND — INVESTMENT IN GENERAL FUND WARRANTS — INDORSEMENT — MANDAMUS AT SUIT OF WARRANT OWNER.

The act of January 22, 1897 (Bal. Code, § 2202), " directing the state treasurer to invest certain moneys in the tide land fund in general warrants," does not authorize the treasurer to pay general fund warrants from moneys in the tide land fund, but merely authorizes him to invest such moneys in the purchase of general fund warrants. (SCOTT, C. J., dissents.)

Under an act authorizing the state treasurer to purchase, instead of pay, warrants drawn on one fund with moneys of another fund, he has no power to compel the warrant holder to surrender a warrant to him, but the state, in such cases, goes into the market upon an equality with other investors. (SCOTT, C. J., dissents.)

An act authorizing the state treasurer to invest moneys in the tide land fund in general fund warrants does not effect a transfer of the tide land fund to the general fund, so as to make the same available for the payment of warrants drawn upon the general fund. (SCOTT, C. J., dissents).

Where it is the duty of the state treasurer to pay warrants drawn upon a certain fund when there are moneys in such fund, and, in case there are none, his duty requires him to indorse on the warrants, " Not paid for want of funds," a private owner of a warrant is entitled to a writ of mandate compelling the officer to perform his duty, when he refuses to make such indorsement and attempts to pay the warrant with moneys of another fund. (REAVIS, J., dissents).

*Original Application for Mandamus.*

*Haight & Owings*, for relator.

*Thomas M. Vance*, Assistant Attorney General, for respondent.

The opinion of the court was delivered by

GORDON, J.—This is an application for a writ of mandate to compel the respondent, as state treasurer, to make the statutory indorsement of " Not paid for want of funds " upon a warrant drawn upon the general fund. The petition upon which the application for the writ is based recites that the relator is the owner and holder of the warrant; that on the 13th of September it was presented to the respondent and, " there being no money in said general fund applicable to the payment thereof, relator demanded that said warrant be indorsed" that it was not paid for want of funds, " that respondent refused to make said indorsement, claiming the right to invest in said warrant at par money in the special tide land fund of the state of Washington, set apart pursuant to chapter 159 of the Session Laws of 1891, for the construction and maintenance of a system of permanent and substantial improvements in aid of commerce and navigation in and for the harbors of the cities and towns of said state wherein tide lands have been sold, and said treasurer accordingly tendered to the relator $125 of said moneys for said warrant, which relator refused to

accept." The petition further shows that at the date of such presentation there was money in the special tide land fund; that the amount of warrants upon the general fund of the state outstanding largely exceeded the cash in said fund or in any fund applicable to the payment of relator's warrant.

The cause was submitted upon a motion to strike certain portions of the petition, and a general demurrer. We think the motion and demurrer present a single question and do not require separate consideration. The act of January 22, 1897 (Laws 1897, p. 3, Bal. Code, § 2202), entitled: "An act directing the state treasurer to invest certain moneys in the tide land fund in general warrants and declaring an emergency," is as follows:

" Section 1. That the state treasurer be and he is hereby directed to invest all moneys now in his hands, or which shall come into his hands prior to the first day of January, 1899, belonging to the tide land fund, in the general fund warrants of the state to be issued hereafter, at the face or par value thereof, without regard to interest due thereon.

Sec. 2. Whereas, at present there is a large amount of money in the tide land fund for which there is no other immediate demand; and whereas, the investment of such money, as directed in section 1 of this act, will result in profit to the state, an emergency exists for the immediate taking effect of this act, and the same shall be in force immediately upon its passage and approval by the governor."

It is a matter of common knowledge that, at the time of the passage of this act, warrants upon the general fund of the state were being sold and discounted for less than their face value, and in determining the purpose and effect of the act that fact may properly be considered. A disposition of this case will be made upon the assumption that it is entirely competent for the legislature to make such adjustment or disposal of the moneys in the tide land fund as may be

considered desirable. Assuming, therefore, without deciding, that such is the character of the moneys in that fund, it becomes important to determine what duty the act of January 22d imposes upon the respondent. Is it to pay warrants drawn upon the general fund with moneys from the tide land fund in the same manner and to the same purpose as if they were drawn upon the latter fund? In other words, are such warrants to be paid and canceled upon presentation, or does the act contemplate the purchase by the state treasurer of such warrants drawn upon the general fund as he may be able to obtain from legal holders " at the face or par value thereof, without regard to interest due thereon? "

There is a manifest difference between a purchase and a payment, and, while the state may rightfully pay its warrants with funds lawfully available for that purpose, it has not the power to compel a lawful holder of a warrant to sell the same to the state or to any other would-be purchaser. If the act contemplates the payment and extinguishment of the warrants, the assumption upon which we are proceeding, viz.: that the legislature may devote moneys in the tide land fund to the payment of general fund warrants, would lead us to conclude that the writ should be denied. Subd. 10, § 105, Gen. Stat. (Bal. Code, § 155), relating to the duties of the state treasurer, provides:

" Upon payment of any warrant, he shall take upon the back thereof the signature of the person to whom it is paid, and return the same to the auditor with his quarterly statement."

On the other hand, if the act contemplates and only authorizes the purchase for the benefit of the tide land fund of such warrants as the treasurer may be able to obtain from willing sellers, at a price not exceeding their " par value

without regard to interest due thereon," the writ must be granted.

The authority conferred by the act is, in our judgment, to *purchase* and not to pay, and we think the language of the act will reasonably admit of no other interpretation. It is stated in the title that the purpose of the act is to direct the state treasurer to "*invest* certain moneys in the tide land fund in general warrants." By section 1 of the act he is "directed to *invest*." Section 2 asserts that "the *investment* of such money . . . will result in profit to the state." The language used is singularly inapt if the legislative intention was to confer authority to pay. The word "invest," as ordinarily used, has no such meaning. The definition of it given by Webster is: "To lay out (money or capital) in business with the view of obtaining an income or profit, as to invest money in bank stock."

In *State, ex rel. Stull, v. Bartley,* 41 Neb. 277 (59 N. W. 907), the supreme court of Nebraska say:

"We are aware of no precise legal definition of the term 'investment' as applied to money. In common speech it means the loaning or putting out of money at interest, so as to produce an income. *(People v. Utica Ins. Co.,* 15 Johns. 358; *Scott v. Depeyster,* 1 Edw. Ch. 513; *Shoemaker v. Smith,* 37 Ind. 122.) It implies the contractual relation of purchaser and seller or borrower and lender, and in that sense it is employed in the constitution."

This view of the act in question is also strengthened by the language of section 1 of the act, which directs that the money should be invested "in general fund warrants of the state to be issued *hereafter,* at the face or par value thereof *without regard to interest due thereon.*" The treasurer is permitted to invest only in warrants issued *after the passage of the act.* If it was the legislative design that the warrants should be paid by the treasurer and *not purchased*

*for the benefit of the tide land fund,* why the words "without regard to interest due thereon?" There could be no interest upon warrants drawn after the passage of the act until they were presented and indorsed; and if it is the duty of the respondent under the act to pay such warrants upon presentation, the words, "without regard to interest due thereon," become absolutely useless and meaningless.

Interpreting the act as we do, however, every word is given force and effect, and is accorded its accepted and ordinary meaning. Thus interpreted, it is beyond the power of the respondent to force the relator to sell his warrant in the manner proposed. In other words, it is the relator's legal right to hold the obligation as an "investment" of his own until in due course there are available funds in the hands of the respondent with which to pay such obligation; and, until such time arrives, he cannot be compelled to relinquish that investment for the benefit of any other individual or of *any fund* under the control of the state.

The constitutional inhibition against interference with private property except for public purposes, where a necessity therefor exists, is as applicable to property of this species as to any other. If the state desires to *"invest"* for profit or otherwise any of the funds over which it has control, it may do so upon terms of equality only; but it cannot compel the individual to part with his property in order that it may be afforded a desirable or profitable investment.

The only case bearing upon this question to which we have been referred is that of *State, ex rel. Stull v. Bartley, supra.* The decision in that case did not, as we think, necessarily involve this question, but it was, nevertheless, considered, and the reasoning of the court is pertinent. In denying the right of the legislature to transfer the perma-

nent school fund of that state, and incidentally determining the meaning of the act authorizing an "investment" of such fund, the court say:

" . . . by no process of reasoning can it be proved that the character of the transaction is altered by calling it an 'investment' instead of 'transfer.' . . . But if the state, as trustee for said fund, desires to invest in that class of securities, it is required to do so on terms of equality with other investors. . . . It follows that the state, in its relation as trustee, can no more require the holder of state warrants to part with them than it can enforce the sale by a citizen of any other species of property."

It seems to us that it would be the establishment of a dangerous precedent to assert that the state might, except in the exercise of the right of eminent domain, forcibly compel a property holder to part with his property without his consent. Under constitutional government the tenure of property is more sacred.

But the respondent urges that, conceding that the act only authorizes the treasurer to invest the moneys in such warrants as holders may be willing to part with at par, the relator has no such interest in this controversy as will enable him to maintain the present action; that he holds at most merely an account or claim against the state for so much money, and cannot be permitted to question the right of the respondent to pay it in any funds which may be tendered him. But this contention, in our judgment, cannot be sustained. The law requires the treasurer, whenever a warrant is presented to him, to do one of two things, either *pay* it or indorse it as required by statute. If he is not in possession of any funds of the state legally available for the purpose of paying it, his plain duty under the statute is to indorse it. To deny the right of the holder of such warrant to enforce compliance with this duty would be to

permit the treasurer to juggle with and evade a duty specially enjoined by law. The right to have such indorsement made is a right conferred by law. The office of the writ of mandate is "to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station." 2 Hill's Code, §736. And while the writ will not issue at the instance of a mere private person who has no more interest in the performance of an act than that shared in common with all other citizens, it is apparent that the interest which the relator has in having the respondent perform the duty of *indorsing his warrant* is not an interest which is shared by others, and he may invoke the remedy. It is enough that the law requires the treasurer to perform the act, and that the relator is interested in having it performed. Of course the right to compel such performance would not exist in a stranger to the warrant, or in any one excepting the lawful holder of it. But it does not lie in the mouth of the officer whose duty is to indorse it to say to the relator, "You have no interest in the question of whether I discharge my duty or not."

Relator advances another reason why he should be interested in having the warrant paid only with funds legally available for that purpose. He urges that if the treasurer paid the same with funds not lawfully applicable therefor, the act would not be binding upon the state and that the state could recover the money so unlawfully paid. We think there is much force in the suggestion, but the importance of the question forbids that we should determine it in a case in which its determination is not necessarily involved.

Our conclusion is that the act of January 22, 1897, does not authorize the state treasurer to pay and cancel general fund warrants with moneys in the tide land fund,

but authorizes and permits merely the purchase of such warrants at their par value without regard to interest, from such parties as may be willing to part therewith; that the effect of the act was not to transfer the tide land fund to the general fund so as to make the same available for the payment of warrants drawn upon the general fund, and that in the present case it is the duty of the respondent to make the indorsement.

The peremptory writ must be granted.

ANDERS, J., concurs.

DUNBAR, J., (concurring).—In concurring in this opinion, I do not find it necessary to pass upon the power of the state to compel the warrant holder to part with his warrant; for, as I construe the act under discussion, the state did not attempt to exercise any such power; but simply authorized and directed the treasurer to invest certain money in state warrants.

REAVIS, J., (dissenting).—The relator, in my opinion, has no standing in court on the facts stated in the complaint. The act of January 22, 1897 (Bal. Code, sec. 2202), set forth in the opinion of the court, imposes certain duties upon the state treasurer. It appeared at the time this law was enacted that a large amount of money was lying in what has been designated "the tide land fund." This, too, was a constantly increasing fund. The object of the law was undoubtedly to use this large amount of money rather than to have it idle and unproductive in the state treasury, and I do not think it material to the rights of the relator whether the direction to the state treasurer in the law be to "invest" this idle money in general fund warrants to be issued hereafter, or to "pay" such general fund warrants to be issued hereafter. The relator's right, and its utmost scope, is to receive payment of the warrant issued to

him. When he received his warrant he could apply to the treasurer for payment; that was what he went to the treasurer's office with his warrant for. And if the treasurer could not pay him, he was then entitled to have the proper indorsement, "not paid for want of funds," written on his warrant, and thereafter it became an interest bearing obligation. The state makes no contract to pay him any interest whatever until after he presents his warrant for payment and payment has been refused. I cannot concede that the relator has any right in law or morals, or any property tangible or intangible, in his claim against the state, that enables him to convert such claim into an interest bearing security at his option. I concede that, if the payment of relator's claim, as evidenced by his warrant, was from a trust fund of which he had knowledge, such payment would be subject to the trust and the liability would be imposed upon the relator to repay money wrongfully diverted from its purpose. But that is not this case. The treasurer is directed to take up "warrants of the state to be issued hereafter" with the fund arising from the sale of tide lands, paying par therefor. Relator's warrant itself was issued with this provision of the law in existence. It became a part of the warrant issued to relator, just as binding as though the provision were written in the warrant.

Viewing the relator as having no special right or interest, then, in the further action of the treasurer, and that he has no interest in the construction of the act, or in the question whether the tide land fund has been repealed or the moneys therein merely invested, and that all these are matters of accounting in the treasurer's office, and the disposition of the tide land fund solely within the power of the legislature, he has no concern further than the receipt of the money tendered to him by the treasurer. If he has no contract right, as I have endeavored to show, violated by this law, then he cannot complain at all.

The court said, in *Jones v. Reed*, 3 Wash. 57 (27 Pac. 1067):

" This court . . . in laying down a policy for this state, deems it safer to relegate the instituting of suits involving the disposition of the revenues of the state, where no private interests are involved, to the judgment and discretion of the attorney general."

"The law, then, having provided an officer for an especial duty, it is the better policy to submit such litigation to his guidance."

Scott, C. J., (dissenting).—Being of the opinion, as at present advised, that the legislature has the power to make any disposition of the tide land fund deemed desirable, and that there is no trust fund involved, I also dissent from the conclusion reached by the majority.

In the first book of Blackstone's Commentaries, at page 86, it is said: "There are three points to be considered in the construction of all remedial statutes; the old law, the mischief and the remedy." And that language is just as forceful today as it was when it was written. Now, under the old law, a large amount of money had accumulated in the state treasury, and the state was continually issuing its evidences of indebtedness. The mischief was that this money was lying idle while the state was compelled to pay interest on its obligations. The act in question was intended to provide the remedy for such an objectionable financial condition.

Of course, one rule to be observed in the construction of a statute is to endeavor to give effect to every part of it. Another, and more important one, is to so construe it, if possible, as to carry out its evident purpose. To do this, words may be taken in a different sense from that in which they are ordinarily understood, if necessary. Sometimes the purpose of an act can only be inferred, and the question

as to what construction should be given the language employed, where it is susceptible of more than one meaning, would have a bearing in determining its purpose, and the usual meaning would ordinarily be given the preference. In this case there is no difficulty in arriving at the purpose, for it is expressly declared in the act itself, in the plainest terms, viz., the using of idle money to effect a considerable saving of interest. That was the profit to be derived.

With these premises, I find no difficulty in construing the terms of the act. It is immaterial whether the transaction contemplated an investment, a payment or a purchase. By it the state would become the holder of its own paper to a considerable amount. The original holder would be paid, for it would undoubtedly be a payment to him. It might still be an investment upon the part of the state, for the benefit of a particular fund. This could make no difference with the prior holder. The warrants would be in effect discharged, for they could not be reissued without express legislative authority reviving them and directing it. The state might preserve them as evidence of the amounts due a particular fund, which it might at some time desire to replace. Such evidence could be as well preserved in that way as in any other. By keeping the warrants intact the money could probably be taken from the general fund in their regular order of payment therefrom to replace the principal in the tide land fund. The word "invest" was probably used through a desire to preserve the particular fund as a distinctive one. But these questions are not in this case and do not concern the relator in any way. Suppose the act had said in terms that the transaction should be deemed a payment to the holder, but an investment on the part of the state for the benefit of the respective funds—the general fund by a saving of interest, the tide land fund by a preservation of the principal.

Could any one doubt the power of the state to do this, at
least so far as this relator is concerned? Or, suppose the
act had provided for the same result in a different way, as
by transferring the money to the general fund and provid-
ing for its return to the tide land fund when warrants so
taken up should be reached in the regular order of pay-
ment from the general fund. Holders of prior warrants,
even, could not complain, for it would be but a temporary
use of moneys coming from a new and separate source from
that provided for their payment. It is evident that these
supposed cases would be but changes in form merely to
reach the same result.

No case deciding the question before us has been called
to our attention. *State, ex rel. Stull, v. Bartley*, 41 Neb.
277 (59 N. W. 907), related to the use of a trust fund,
the decision rested upon a constitutional question, and what
is said of investment, transfer, etc., has little or no signifi-
cance in construing the act before us. The state certainly
has absolute control over its moneys and the issuing of its
evidences of debt. It should not be compelled to put its
interest bearing obligations afloat and then go on the mar-
ket as a purchaser in order to use its idle moneys, no con-
tract rights being violated.

No question of a compulsory sale or purchase is involved
here. The issuance of the warrant by the state auditor to
the holder was authorized, and the relator had the right to
carry it indefinitely. There was no compulsion upon him to
present it to the treasurer at any time, and thus give the
state an opportunity to take it up under the act in question.
It is true that it was not then an interest bearing obligation;
it could only become such after a presentation to the treas-
urer for payment and his indorsement thereon, "not paid
for want of funds." Now, it being the state's money that
was being used, and lawfully used, so that the relator would

3—18 WASH.

have the right to retain it after he got it, that is all that concerns him. He should have no right to refuse the money, having presented his warrant to the treasurer, and compel a further act on the part of the state to make it an interest bearing obligation. If he was being paid in funds which he would have no right to retain after having received them, I am of the opinion that he would have a right to object and compel the indorsement; but not otherwise.

If the purpose were not declared, the passage of the act might have been ascribed to several different reasons; one, to enable the subsequent warrant holders to obtain par for their warrants, there being considerable money in the tide land fund; another, to provide a fund which would have the effect of keeping the market value of warrants subsequently issued at par. But the act does contain an express declared purpose, which would result in the saving of a large amount of money to the state, if enforced. It can be enforced and effect given to every part of the act. At the time it was passed there was considerable money in the tide land fund. In consequence of the expenses of the legislative session then being held, it was apparent that warrants aggregating a large sum would soon be issued, and the moneys then in such fund might be temporarily exhausted thereby. Then holders of warrants subsequently issued would be entitled to have them converted into interest bearing obligations by the necessary indorsement. Likewise the holder of a warrant issued prior to such exhaustion of the fund and after the passage of the act, but who had chosen not to present it so that it could be taken up, could then present it and have it indorsed. But there being moneys coming into said fund from time to time, and sometimes in large amounts, the holders of such indorsed warrants might thereafter present them, when there was money

on hand, and have them paid, but "without regard to interest due thereon." This might be a valuable right in case warrants should continue at a discount, and, although that would be improbable, it was wise forethought to provide for it. Such holders would thus be placed as nearly as possible on the same footing as other holders of warrants issued after the act was passed. They could obtain the principal as soon as the moneys should be paid into the fund, if they wanted it, and not lose their right to such payment simply because the warrants had been indorsed, "not paid for want of funds," when they were first presented, because there was no money then available. But they were not bound to even then present them, it being solely a matter of choice with them, and the warrants would continue to bear interest, if not again presented. The money could still be used to take up other warrants when they should be first presented for payment, which had not been indorsed. No contract rights would be involved in any way. The state was not a purchaser and would pay no premium. There was no way to reimburse itself, if it should pay a premium. Neither would it take advantage of any possible discount, for it proposed to pay the full principal. It evidently did not want to discredit its own paper. But it would not pay any accrued interest, if the holders did choose to present such indorsed warrants subsequently issued. There was a reason for this, also, for such interest would bear no interest, while the outstanding principal was interest bearing; and by investing or using or paying the moneys in the tide land fund, on the principal alone a greater saving of interest, or a greater profit, whichever term may be used, resulted; and thus the clause, "without regard to interest due thereon," has a useful and legitimate bearing.

While it is true that at the time the act was passed state warrants were somewhat below par, it is equally true that this was an exceptional and temporary state of affairs, and it could not be presumed that the legislature assumed that it would always continue. Nor is it likely that they intended to pass such an ineffectual act as this one is under the construction adopted by the majority, for with warrants at a premium, as they are and nearly always have been, the state can obtain none, and the mischief of carrying a large amount of idle money, with its attendant dangers of loss, and at the same time paying a large amount of interest on its obligations, is continued.